1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6

* * *

7

Case No. 2:13-cv-01208-JAD-PAL

8

KENNETH L. MITCHELL,
                              Plaintiff,

**REPORT OF FINDINGS AND RECOMMENDATION**

9

v.

10

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

(Mtn to Reverse – Dkt. #13)
(Cross Mtn SJ – Dkt #15)

11

                              Defendant.

12

13        This case involves judicial review of administrative action by the Commissioner of Social

14    Security denying Plaintiff Kenneth L. Mitchell's ("Mitchell") claim for Supplemental Security

15    Income ("SSI") under Title XVI of the Social Security Act (the "Act").

16                                        **BACKGROUND**

17        On March 8, 2010, Mitchell filed an application for SSI benefits, alleging he became

18    disabled on November 1, 2009.  AR[1] 124.  The Social Security Administration ("SSA") denied

19    Mitchell's claim initially and on reconsideration.  AR 75-79, 81-84.  A hearing before an

20    Administrative Law Judge ("ALJ") was held on November 30, 2011, in Las Vegas, Nevada,

21    before ALJ David K. Gatto.  AR 38-57, 90.  On December 21, 2011, the ALJ issued a decision

22    denying Mitchell's application.  AR 32.  The ALJ's decision became the final decision of the

23    Commissioner when the Appeals Council denied Mitchell's request for review on May 10, 2013.

24    AR 1-4.

25        On July 9, 2013, Mitchell filed an Application to Proceed In Forma Pauperis (Dkt. #1)

26    and submitted a complaint in federal court, seeking review of the Commissioner's decision

27

28    _____

[1] AR refers to the Administrative Record, which was delivered to the undersigned upon the commissioner's filing of her Answer (Dkt. #10) on October 21,2013.

1  pursuant to 42 U.S.C. § 405(g).  The court screened Plaintiff's Complaint (Dkt. #4) pursuant to

2  28 U.S.C. § 1915.  *See* Screening Order (Dkt. #3).  The Commissioner timely filed her Answer

3  (Dkt. #10) on October 21, 2013.  Mitchell filed a Motion for Remand (Dkt. #13) on November

4  12, 2013.  The court has considered the Motion to Remand and the Commissioner's Response

5  and Cross-Motion to Affirm (Dkt. #14) filed December 12, 2013.

6  **DISCUSSION**

7  **I.      Judicial Review of Disability Determination**

8  District courts review administrative decisions in social security benefits cases under 42

9  U.S.C. § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute

10  provides that after the Commission of Social Security holds a hearing and renders a final

11  decision, a disability claimant may seek review of the Commissioner's decision by filing a civil

12  lawsuit in federal district court in the judicial district where the claimant lives.  *See* 42 U.S.C.

13  § 405(g).  That statute also states the district court may enter, "upon the pleadings and transcripts

14  of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of

15  Social Security, with or without remanding the cause for a rehearing."  *Id*.  The Ninth Circuit

16  reviews district court decisions affirming, modifying, or reversing the Commissioner's decision

17  de novo.  *Batson v. Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

18  The Commissioner's findings of fact are conclusive if supported by substantial evidence.

19  42 U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the

20  district court may set aside the Commissioner's findings if based on legal error or not supported

21  by substantial evidence.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir.

22  2006); *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit

23  defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is

24  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

25  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d

26  1211, 1214 n. 1 (9th Cir. 2005).  In determining whether the Commissioner's findings are

27  supported by substantial evidence, the court "must review the administrative record as a whole,

28  weighing both the evidence that supports and the evidence that detracts from the Commissioner's

conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Under the substantial evidence test, the district court must uphold the Commissioner's findings if supported by inferences reasonably drawn from the record.  *Batson*, 359 F.3d at 1193.  Additionally, when the evidence will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).  Consequently, the issue before the court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

The ALJ must make specific findings so the court does not speculate as to the basis of the findings when determining whether substantial evidence supports the Commissioner's decision. Mere cursory findings of fact without explicit statements as to what portions of the evidence were accepted or rejected are not sufficient.  *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).  The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based."  *Id.*

## II.   Disability Evaluation Process

The claimant bears the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet the burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant must provide "objective medical evidence" to support his or her claim of disability.  *Smolen*, 80 F.3d at 1281.  If a claimant establishes an inability to perform his or her prior relevant work ("PRW"), the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in significant numbers in the national economy.  *Batson*, 157 F.3d at 721.

/ / /

3

The ALJ follows a five-step sequential evaluation process in determining whether an individual is disabled.  *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  If at any step, the ALJ makes a finding of disability or non-disability, no further evaluation is required.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).  The first step requires the ALJ determine whether the individual is currently engaging in substantial gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b).  The statute defines SGA as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b). If the individual is currently engaging in SGA, then the ALJ must find the individual is not disabled.  If the individual is not engaging in SGA, then the analysis proceeds to the second step.

The second step addresses whether the individual has a medically determinable impairment that is severe, or a combination of impairments that significantly limits him or her from performing basic work activities.  *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work.  *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[2]  If the individual does not have a severe medically determinable impairment or combination of impairments, then the ALJ must find the individual is not disabled.  If the individual has a severe medically determinable impairment or combination of impairments, then the analysis proceeds to the third step.

Step three requires the ALJ determine whether the individual's impairments or combination of impairments meet or medically equal the criteria of impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.  If the individual's impairment or combination of

---

[2] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009);  *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference, as they are consistent with the Act and regulations.  *See Bray*, 554 F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

4

1    impairments meet or equal the criteria and duration requirement of a listing (20 C.F.R.

2    §§ 404.1509 and 416.909), then the ALJ must find the individual is disabled.  See 20 C.F.R.

3    §§ 404.1520(h) and 416.920(h).  If the individual's impairment or combination of impairments

4    do not meet or equal the criteria and duration requirement of a listing, then the analysis proceeds

5    to the next step.

6        Before considering step four of the sequential evaluation process, the ALJ must first

7    determine the individual's residual functional capacity ("RFC").  See 20 C.F.R. §§ 404.1520(e)

8    and 416.920(e).  RFC is a function-by-function assessment of the individual's ability to do

9    physical and mental work-related activities on a sustained basis despite limitations from

10   impairments.  See SSR 96-8p.  In making this finding, the ALJ must consider all the individual's

11   symptoms and the extent to which the symptoms conform to the objective medical evidence and

12   other evidence.  See 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p.  To the extent

13   that statements about the intensity, persistence, or functionally limiting effects of pain or other

14   symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on

15   the credibility of the individual's statements based on a consideration of the entire case record.

16   Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991).  The ALJ must also consider medical

17   opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and

18   SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

19       Step four requires the ALJ determine whether the individual has the RFC to perform

20   PRW.  See 20 C.F.R. §§ 404.1520(f) and 416.920(f).  PRW means work the individual

21   performed within the past 15 years, that was substantial gainful activity, and that lasted long

22   enough for the individual to learn to do it.  See 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b),

23   and 416.965.  If the individual has the RFC to perform his PRW, then the ALJ must find the

24   individual is not disabled.  If the individual is unable to perform any PRW or does not have any

25   PRW, then the analysis proceeds to the fifth and final step.

26       Step five requires the ALJ determine whether the individual is able to perform any other

27   work considering his residual functional capacity, age, education, and work experience.  20

28   C.F.R. §§ 404.1520(g) and 416.920(g).  A claimant establishes a prima facie case of disability by

showing his or her disability prevents performance of his or her previous occupation. *Smolen*, 80
F.3d at 1289.  Once the claimant establishes a prima facie case, the burden shifts to the
Commissioner to show the claimant can perform other types of work that exist in significant
numbers in the national economy, given the individuals, age, education, work experience, and
RFC. *Id*. *Yuckert*, 482 U.S. at 141-42.  If the individual can do other work, then the ALJ must
find the individual not disabled. *See* 20 C.F.R. §§ 404.1560(b)(3).

**III.**   **Factual Background**

      **A.**   **Testimony at Administrative Hearing**

Plaintiff appeared and testified before ALJ David Gatto in Las Vegas, Nevada, on
November 30, 2011, with his attorney Charles York.  AR 40.  Vocational Expert Dr. Genereau
also appeared and testified. *Id*.

Mitchell testified he has four children and he makes sure they are dressed and ready for
school in the mornings.  AR 43.  Mitchell stated he helps his children with their homework when
they come home from school.  AR 44.  Mitchell spent the majority of his days on the couch, but
if he was feeling well, he occasionally did housework. *Id*.

Mitchell has a GED.  AR 42.  His last job was as assistant manager at Vitamin World, but
he was terminated because of a conflict with the store manager.  AR 44.  Prior to that, Mitchell
worked at several fast food restaurants, as a mechanic, and as a security guard.  AR 44, 50.
Mitchell testified that his job as a security guard required him to patrol a hotel.  AR 45.

Mitchell testified he had trouble moving his neck. *Id*.  Mitchell's neck pain kept him up
at night and occasionally shot into his shoulders and arms.  AR 46.  Mitchell had difficulty
picking up heavy objects, but could carry light groceries. *Id*.  Mitchell's lower back caused him
pain when sitting for too long. *Id*.  He injured his lower back while working in 2000 or 2001 in
the automotive field, but did not report it because he was the only one working. *Id*. at 46-47.

Mitchell testified that he was seeing a physician, and also had seen a counselor for about
two years for his mental impairments.  AR 47.

/ / /

/ / /

Mitchell testified that he was prescribed and took Daypro[3], Metformin[4], Gabapentin[5], Aspirin, Lisinopril[6], Amlodipine[7] and Lamotrigine.[8]   AR 47-48.  Mitchell stated the medications made him very "sluggish."  AR 49.  Mitchell testified that he could not return to the workforce because walking, bending, stooping, lifting, or standing, was difficult.  *Id.*  Additionally, Mitchell stated he has issues being around large groups of people.  *Id*.

The ALJ asked the vocational expert to assume a hypothetical claimant with at least a high school education, and the same work history as Mr. Mitchell, with the impairments of personality disorder and affective disorder, attention deficit disorder, with a diagnosis of obesity, degenerative joint disease of the knees, with a history of neuropathy, and a history of back pain. The hypothetical also asked the vocational expert to assume that these impairments limited the hypothetical man to work at the light exertional level, occasionally lifting up to twenty pounds, frequently lifting ten pounds or less, and standing or walking up to six hours in an eight-hour

---

[3] Daypro, or Oxaprozin, is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat mild to moderate pain and help relieve symptoms of arthritis (osteoarthritis and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.  *See* Mayo Clinic, *Oxaprozin (Oral Route)*, Mayo Clinic (Feb. 1, 2014), available at http://www.mayoclinic.org/drugs-supplements/oxaprozin-oral-route/description/drg-20069737 (last visited June 18, 2014).

[4] Metformin is used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes.  *See* Mayo Clinic, *Metaformin (Oral Route)*, Mayo Clinic (Dec. 1, 2013), available at http://www.mayoclinic.org/drugs-supplements/metformin-oral-route/description/drg-20067074 (last visited June 18, 2014)

[5] Gabapentin is used to help control partial seizures (convulsions) in the treatment of epilepsy, and used in certain patients with diabetic peripheral neuropathy.  *See* Mayo Clinic, *Gabapentin (Oral Route)*, Mayo Clinic (Dec. 1, 2013), available at http://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited June 18, 2014).

[6] Lisnopril is used to treat high blood pressure (hypertension).  *See* Mayo Clinic, *Lisnopril, (Oral Route)*,  Mayo Clinic (Nov. 1, 2013), available at http://www.mayoclinic.org/drugs-supplements/lisinopril-oral-route/description/drg-20069129 (last visited June 18, 2014).

[7] Amlodipine is used to treat angina (chest pain) and high blood pressure.  *See* Mayo Clinic, *Amlodipine, (Oral Route)*, Mayo Clinic (Feb. 1, 2014), available at http://www.mayoclinic.org/drugs-supplements/amlodipine-oral-route/description/drg-20061784 (last visited June 18, 2014).

[8] Lamotrigine is used to help control certain type of seizure and epilepsy.  *See* Mayo Clinic, *Lamotrigine, (Oral Route)*,  Mayo Clinic (Dec. 1, 2013), available at http://www.mayoclinic.org/drugs-supplements/lamotrigine-oral-route/description/drg-20067449 (last visited June 18, 2014).

day, and sitting about six hours of an eight-hour day with occasional climbing of stairs or ramps, and no climbing of ladders, ropes or scaffolds.  The hypothetical also assumed limited balancing, and occasional kneeling, stooping, crouching or crawling with no exposure to extremities of cold, to heights, or constantly moving machinery.  Finally, the hypothetical posed limited the work to unskilled work with occasional, or no more than occasional contact with all others in the work place.  AR 51-52.  The ALJ asked if this hypothetical claimant would be able to do any of Mr. Mitchell's past relevant work.  AR 52.  Dr. Genereau testified such a claimant would be precluded from all of Mitchell's PRW that was at least semi-skilled.  *Id*.  However, he could do the dishwasher job, except for industrial dishwashing due to the high heat.  *Id.*  There were 138,303 light dishwasher positions in the United States, and approximately 2,000 positions in Nevada.  *Id.*  The hypothetical claimant could also perform work as a janitor, classified as a light, unskilled position with 138,120 jobs available nationally, and 1,556 positions in Nevada; a garment presser, a light unskilled position with 43,533 positions nationally, and 369 positions in Nevada; and a dining room attendant, a light unskilled position with 71,761 positions nationally and 2,446 positions in Nevada.  AR 52-53.

The ALJ then posed a second hypothetical to the vocational expert.  The hypothetical assumed that the hypothetical man would be limited to sedentary work, occasionally lifting up to ten pounds, frequently lifting less than ten pounds, standing and walking up to two hours out of an eight-hour day, sitting up to six hours out of an eight-hour day with occasional contact with others in the workplace.  AR 53.  Dr. Genereau testified that such a hypothetical person could work as a (1) hand packager, a light, unskilled position with 21,362 positions nationally and 134 positions in Nevada; (2) bookkeeping clerk, a light unskilled position with 68,486 positions nationally and 690 positions in Nevada; (3) or bill sorter, a light, unskilled position with 16,564 positions nationally and 212 positions in Nevada.  AR 53-54.  Dr. Genereau testified that postural consideration such as climbing up stairs or ramps, balancing, stooping, kneeling, etc., as well as environmental exposure to hazards or temperature extremes were not significant considerations for any of the sedentary work listed.  AR 54.

1    Finally, in a third hypothetical, the ALJ asked whether the same hypothetical man would

2    be competitively employable if he was absent more than two days a month.  Dr. Genereau

3    testified that no more than two days a month would be "tolerable absenteeism."  AR 55.

4    **B.**    **Mitchell's Medical Records.**

5    **1.**    **Mitchell's Adult Function Reports.**

6    Mitchell completed Adult Function Reports on April 1, 2010, and on October 17, 2010.

7    AR 163, 205.  Mitchell reported suffering from mental illness that negatively affected his ability

8    to interact with others.  AR 164.  Mitchell cared from his minor daughter and pets.  *Id*.  He

9    needed reminders to keep up with personal hygiene.  AR 165.  Mitchell prepared meals daily and

10   performed household chores including laundry, taking out the trash, general cleaning, and

11   picking up after his dogs, but he reported needing constant verbal reminders from his girlfriend

12   to complete tasks.  *Id*.  Mitchell was unable to drive or go outside alone.  AR 166.  He shopped

13   for groceries about three times per month.  *Id*.  He could count change but was unable to pay

14   bills or manage a bank account.  *Id*.  He occasionally misplaced money.  AR 209.

15   Mitchell reported spending time on the internet and watching TV regularly.  AR 163.

16   Mitchell no longer engaged in hobbies because of "physical and verbal conflicts."  AR 167.  He

17   did not spend time with anyone but his girlfriend, daughter, and uncle.  AR 209.  His only

18   interaction with people outside the home was at doctors' appointments or over the internet.  *Id*.

19   Additionally, Mitchell needed reminders regarding his appointments and required a chaperone to

20   help him "control any possible conflicts."  *Id*.

21   Mitchell reported he did not get along with his neighbors, and interactions with family

22   result in "many verbal fights."  AR 168.  He did not participate in social activities.  *Id*.  He could

23   walk for about a block before requiring five minutes of rest.  *Id*.  He could follow written

24   instructions, but verbal instructions require several explanations.  *Id*.  He reported not handling

25   stress well.  AR 169.  Mitchell's last employer, Vitamin World, terminated him because of a

26   conflict with his boss.  AR 211.

27   / / /

28   / / /

9

### 2.    Lori Swayze – Function Report.

Mitchell's girlfriend, Lori Swayze, completed a Function Report concerning Mitchell on April 3, 2010.  AR 175.  She reported that Mitchell got their daughter ready for school, took her to school, and helped her with homework every day.  *Id.*  She described his activities as taking medications, eating, watching television and going on the internet, picking up their daughter, making dinner and watching more television.  *Id.*  He also fed and watered the dogs and cleaned up after them.  *Id.*  Mitchell could not be around people without becoming agitated.  AR 176.  Mitchell's illness negatively affected his sleep and caused him to get out of bed several times a night.  *Id.*  He was able to take the trash out and do laundry and clean up after the dogs, although she needed to remind him to clean the house and do yard work and change the clothes from the washer to the dryer.  AR 177.  Mitchell was either with her or his uncle to avoid getting agitated when he went out.  AR 178.  Swayze reported that she and Mitchell had many verbal fights.  AR 180.  He did not like to deal with authority or change.  AR 181.

She filled out a second report on October 16, 2010, indicating that Mitchell required reminders to keep up personal hygiene.  AR 214.  He prepared his own food and did dishes for about an hour before needing to rest.  AR 215.  He went out only when necessary and got agitated easily.  AR 216.  He shopped for food two times a month.  *Id.*  He sometimes misplaced money.  AR 217.  He liked to watch television, work on his car, and play with the dogs, but was no longer able to work on cars or play with the dogs.  *Id.*  He regularly took his daughter to school and went to doctor appointments.  *Id.*  Walking, squatting, standing and stairs bothered his knees, and he had trouble focusing and remembering things.  AR 218.  He was able to pay attention for about ten minutes and follow instructions if they are written.  *Id.*  He did not like authority and was fired at his last job at Vitamin World for conflicts with his boss.  AR 219.  He did not like to have anything changed and was more anxious than he used to be.  *Id.*  He used a cane when walking.  *Id.*

### 3.    Robin Heil - Function Report

Robin Heil, Mitchell's friend of thirty-three years, completed a Function Report concerning Mitchell on October 16, 2010.  AR 195.  Heil spent a couple of hours every other day

with Mitchell taking him grocery shopping and to all of his many appointments. *Id.* He reported

Mitchell could not focus on tasks long enough to maintain employment. *Id.* Mitchell was unable

to stand or walk for extended periods. *Id.* Mitchell's violent outbursts would make it impossible

for him to maintain employment. *Id.* Heil reported that he picked up Mitchell's daughter from

school. AR 196. Mitchell took care of his eight-year-old daughter. *Id.* Mitchell had trouble

sleeping because of worries and stresses and got little or no sleep. *Id.* He had difficulty with his

own personal care. *Id.* Mitchell could walk 100 feet before needing to stop and rest after about

five minutes. AR 200. He did not get along with authority figures and was fired from his job

because of a conflict with his supervisor and other employees. AR 201. Mitchell always used a

wheelchair cart at stores. *Id.* He suffered from anxiety and depression. *Id.*

### 4.      Stefanie Stolinsky's Mental Status Evaluation

On June 24, 2010, clinical psychologist Stefanie Stolinsky, Ph.D, psychologically

evaluated Mitchell at the request of the Bureau of Disability and Adjudication. AR 363-368. In

drafting her report, Dr. Stolinsky used information from an April 1, 2010, psychiatric evaluation

by the SSA and a function report Lori Swayze completed on April 3, 2010. *Id.* Mitchell

reported that he had racing thoughts, but that he could care for others. *Id.* He reported hearing

voices and his insight and judgment were poor. *Id.* He stated he was driven to the appointment

by his uncle who drives him everywhere. AR 364. His gait was normal and gross motor skill

impairments were not noted. *Id.* He was not using a brace or wheelchair and his posture was

normal. *Id.* He did not have speech, hearing, or vision difficulties, and did not appear to have a

psychosis. *Id.* He did not have delusions, perseverations, word salad, loose associations,

tangential thinking or other cognitive signs of psychotic thinking processes. *Id.*

He reported a long history of methamphetamine use and abuse that may or may not have

contributed to his current mood swings, angry outbursts, impulsivity and bipolar symptoms. He

stopped using daily fifteen years prior. *Id.*

On physical examination, he was 5"11", weighed 263 lbs., and reported he had gained

over 65 lbs. in the last few months. *Id.* His gestures were shaky and fine motor skills of the

hands were impaired by a tremor. *Id.* He slouched and found it difficult to sit still. He was neat

and clean and appropriately dressed.  *Id.*  His attention and concentration were adequate to establish rapport and complete the evaluation as was his speech.  *Id.*  His mood and affect were anxious more than depressed.  He reported depression of a five on a scale of zero (no depression) to ten (most depressed).  On mental status exam he was oriented to person, place and date.  AR 365.  He did not exhibit compulsions or obsessions, denied hallucinations or delusions, but was being medicated for both.  *Id.*  He had no phobias, severe free-floating anxiety, loss of identity, and no cognitive dysfunction.  *Id.*  He was able to complete serial threes, spell words backwards, and recall words after five minutes.   He became confused with alpha numeric reasoning and displayed an adequate fund of knowledge.  *Id.*  His abstract reasoning was not impaired on testing.  AR 366.

He reported a history of battery and acting out aggressively, and that he had been jailed on psychological watch.  AR 367.  He was last employed as an auto mechanic in 2002, and then as a security guard.  *Id.*  He worked for twelve years and got along well at the worksite, but had an anger impulse problem.  *Id.*

Dr. Stolinsky's diagnostic impressions were: bipolar I disorder; attention deficit hyperactivity disorder; and anti-social personality disorder; and that he was stressed from difficulty holding his temper and bad thoughts.  AR 367.  Dr. Stolinsky's functional assessment was that Mitchell would be able to perform simple, straightforward tasks, but could have serious anger and aggression problems with coworkers, supervisors, and the public.  *Id.*  He would be able to understand and carry out simple tasks and complete them and to attend to and concentrate on simple tasks.  *Id.*  However, Dr. Stolinsky noted Mitchell "could decompensate if things went wrong at work, if personnel changed or if anything he was used to doing changed."  *Id.*  Finally, Dr. Stolinsky noted Mitchell's psychiatrist should monitor him to make sure his medications had stabilized his bipolar illness, and Mitchell should be re-evaluated after his bipolar I illness was stabilized for six months.  *Id.*

### 5.   Las Vegas Radiology

On February 15, 2010, Las Vegas Radiology ("LVR") completed an MRI of Mitchell's left and right knees, and it revealed no abnormalities.  AR 326-27.

On December 28, 2011, LVR completed an MRI of Mitchell's lumbar spine. AR 577-578. The MRI of L1-L2 was unremarkable; the L2-L3 disc demonstrated a bulge; the L4-L5 disc was narrowed and demonstrated disc herniation with compression on the thecal sac centrally; the L5-S1 disc was desiccated with a posterior bulge with an annular tear; and moderate bilateral L3-L4, L4-L5, and L5-S1 foraminal narrowing was noted. *Id*.

### 6.      Nevada Orthopedic & Spine Center – Dr. Gary D. Morris

On February 2, 2010, Mitchell saw Dr. Gary Morris for treatment of knee pain unrelated to an injury. AR 329. An x-ray revealed minimal decreased joint space in the medial compartments of both knees, but was otherwise unremarkable. *Id*. An MRI of both knees was ordered. *Id*. He returned on March 11, 2010, for the result of the MRI which revealed no abnormalities. AR 328. Dr. Morris offered Mitchell injections to both knees to help with the pain. AR 328. Mitchell declined the treatment because he felt it would increase his blood sugar. *Id*. Dr. Morris suggested physical therapy and continuing an anti-inflammatory regimen. *Id*.

The Social Security Administration sent a letter to Dr. Morris March 15, 2010, indicating that Mitchell had applied for Social Security benefits and requested a report concerning Mitchell's treatment from November 1, 2008, to the present, and other information. AR 331-332. However, if Dr. Morris prepared a report, it is not in the Administrative Record.

### 7.      Dr. Ron Zedek

On December 10, 2009, Mitchell saw Dr. Ron Zedek, M.D., for a psychiatric consultation. AR 411. Mitchell reported this was his first formal psychiatric contact and that he had never been psychiatrically hospitalized. *Id*. Mitchell complained of mood swings, irritability, "interpersonal-aggressivity," rage attacks, pressured speech, grandiosity, and tearful dysphoric spells occurring every day for a period exceeding five months. *Id*. He also reported a family history of bipolar disorder. *Id*. A mental status exam was remarkable for no suicidal ideation, no homicidal ideation, no paranoid ideation, no delusions, no visual hallucinations, and no auditory hallucinations. *Id*. Mitchell's mood was depressed and affect irritable with mood swings. *Id*. He was alert and oriented times four, his insight and judgment was good, and had well-delineated futuristic thoughts and plans. *Id*.

On medical assessment he reported a history of diabetes mellitus, hypertension, elevated cholesterol, and diabetic neuropathy.  AR 412.  Dr. Zedek diagnosed Mitchell with bipolar disorder, mixed, without psychotic features.  *Id.*  Dr. Zedek prescribed Geodon and recommended a metabolic workup, but the patient refused indicating his primary physicians check all of these things.  *Id.*  Mitchell was to return for supportive psychotherapy and medication management in a few days.  *Id.*

Dr. Zedek saw Mitchell eight times between December 17, 2009, and March 18, 2010. AR 403-410.  At each visit, Dr. Zedek noted the mental status exam was remarkable for mood swings and irritability, but medication had considerably reduced Mitchell's mood swings and irritability.  *Id.*  A January 7, 2010 progress note indicates that Mitchell had mood swings and irritability "but they are much less."  AR 408.  Similar notes are made in progress notes dated January 21, 2010 (AR 47), February 4, 2010 (AR 406), February 18, 2010 (AR 405), and March 4, 2010 (AR 404).  By March 18, 2010, the doctor's progress notes indicated that Mitchell had mood swings and irritability "but much less intense than before."  AR 403.  The same observation was made in progress notes dated April 1, 2010 (AR 402), and April 15, 2010 (AR 401),  However, on April 29, 2010, Mitchell reported auditory hallucinations in addition to his mild mood swings and irritation.  AR 400.  He had no suicidal or homicidal ideation and had well-delineated futuristic thoughts and plans.  *Id.*  As a result, Dr. Zedek increased Mitchell's medication dose.  *Id.*

On June 19, 2010, Mitchell reported auditory hallucinations, mood swings and irritability.  AR 394.  Mitchell did not feel that the Geodon was helping and reported feeling sedated on it as well.  *Id.*  Dr. Zedek reduced Mitchell's dosage of Geodon, and prescribed Risperadone.  *Id.*  He opined that Mitchell had bipolar disorder, mixed, with psychotic features, auditory hallucinations, and mood swings and irritability.  *Id.*  He also opined that Mitchell was "way too impaired to work, and his disability needs to be thought of as permanent because of the fact that he is not able to tolerate any degree of stress, even the most minimal."  *Id.*  Additionally, Dr. Zedek noted that coercing Mitchell to work "would probably result in psychiatric

hospitalization and psychiatric decompensation." *Id*. Dr. Zedek advised Mitchell to "get disability" because he had a concern about Mitchell even trying to work. *Id.*

Progress notes dated between December 30, 2010, and October 29, 2011, indicate that Mitchell saw Dr. Zedek twenty-three times during this period. AR 505-507. The notes are very brief, and most of them indicate that Mitchell reported feeling mildly depressed and that he and the doctor worked on staying positive and coping with stress.

On April 17, 2012, Dr. Zedek filled out a Mental Impairment Questionnaire for Mitchell. AR 570. Mitchell's attorney supplied this additional information to the Appeals Council. AR 569. In the questionnaire, Dr. Zedek indicated Mitchell had bipolar disorder, was depressed without psychotic features, and had been seen since December 10, 2009 once a month. *Id*. Dr. Zedek noted Mitchell's symptoms as personality change, mood disturbance, emotional liability, oddities of thought, perception, speech or behavior, social withdrawal or isolation, difficulty thinking or concentrating, generalized persistent anxiety, and hostility and irritability. AR 570-571. Dr. Zedek indicated that Mitchell's impairment was ongoing and lifelong. AR 571. Mitchell was not a malingerer, and his impairments were consistent with symptoms and functional limitations described in the evaluation. *Id*. Mitchell was expected to continue with treatment and medications on a monthly basis. *Id*. He was prescribed Lamictal twice daily and his prognosis was guarded. AR 572. Dr. Zedek anticipated that, because of Mitchell's impairments or treatment, he was likely to be absent from work more than three times a month. *Id*. Dr. Zedek noted Mitchell would have a difficult time "handling even the most entry-level position." AR 573. Dr. Zedek opined Mitchell had marked restrictions of daily living activities and marked difficulty in maintaining social functioning. *Id*. Mitchell also had constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and repeated (three or more) episodes of decompensation in work or work-like settings. *Id*.

### 8.   University Medical Center

On September 16, 2009, University Medical Center ("UMC") admitted Mitchell with acute chest pain. AR 243. Dr. Randy Calegari assessed Mitchell with hypertension and

prescribed Lisinopril to control his blood pressure.  *Id*.  Additionally, Dr. Calegari assessed Mitchell with insulin-dependent diabetes mellitus, and provided Mitchell with diabetic teaching and insulin training during his hospitalization.  *Id*.  The doctor noted Mitchell's blood sugars were "fairly out of control" and diagnosed hypertriglyceridemia.[9]  *Id*.  Two chest x-rays showed no acute pulmonary process.  AR 259.  An EKG stress test was negative for ischemia and average exercise capacity and blood pressure were noted.  AR 263-265.

He was seen as an outpatient at UMC on various occasions between November 5, 2009 through June 20, 2010 for routine illnesses such as sinus congestion, earaches, and to request diabetic medication and supplies.  On March 11, 2010, he reported to the emergency room complaining of abdominal discomfort.  AR 333-340.

On October 12, 2010, Mitchell sought treatment at UMC's emergency room for headache with blurry vision and left-sided body weakness lasting twenty minutes.  AR 417-437.  He underwent a lumbar puncture that was negative for blood or infection.  AR 418.  His blood sugar and vital signs were stable.  *Id*.  An MRI/MRA of the brain and neck were negative as well.  *Id*.  Mitchell's symptoms resolved shortly after admission.  *Id*.  Mitchell was discharged the following day.  *Id*.  His discharge diagnoses were quite: "questionable" transient ischemic attack; diabetes mellitus; hypertension; and nicotine addiction.  *Id*.  When he indicated he did not have a primary care physician, he was told to establish one at the Lied Clinic with Internal Medicine residents in one to two weeks.  *Id.* at 419.

### 9.   Summerlin Hospital Medical Center

He was seen in the ER at Summerlin on November 10, 2009, complaining of chest pain. AR 291-317.  The medical records for this admission indicate under the history of his present illness he was a "very active 33-year-old male with a history of diabetes, hypertension, tobacco abuse, and obesity."  AR 296.  Mitchell reported that his medical conditions had been uncontrolled until about three months prior when he was initially diagnosed.  He had not been

---

[9] High level of triglycerides, a type of fat (lipid) found in blood. *See* Mayo Clinic, *Trigylcerides: Why do they matter?*, Mayo Clinic (Sept. 12, 2012), available at http://www.mayoclinic.org/diseases-conditions/high-blood-cholesterol/in-depth/triglycerides/art-20048186 (last visited June 18, 2014).

compliant with medications because of insurance reasons, but now had insurance and reported he

had been following up regularly with his regular doctor.  *Id.*  He complained of left-sided chest

pain that he described as a squeezing pressure-type pain that started around 7:00 the night before.

A chest x-ray was taken which was negative.  An EKG was performed which revealed normal

sinus rhythm.  A stress test was also performed which was normal.  AR 298.  Mitchell was

discharged the following day with a prescription for Omeprazole, and instructed to take over-the-

counter Motrin, stop smoking, resume his home medications, resume an ADA diet, and activity

as tolerated.  *Id.*

### 10.  Rainbow Medical Center – Dr. Judd Fisher.

On January 20, 2010, Mitchell was first seen to establish primary care, and to get a

referral to see Dr. Troy Watson regarding neuropathic pain.  AR 451.  He also had questions

regarding erectile dysfunction.  *Id.*  He reported a past history of diabetes mellitus, peripheral

neuropathy, and mood disorder as well as hypertension and dyslipidemia.  *Id.*  He was currently

taking Metformin twice daily.  *Id.*  On physical examination, his vital signs were stable and

afebrile.  He reported having spikes of blood pressure in the afternoon and evening, and the

decision was made to increase his blood pressure medication.  *Id.*  The doctor's impression was

diabetic peripheral neuropathy, diabetes mellitus, uncontrolled most recent glycohemoglobin was

8.5; hypertension, and dyslipidemia.  *Id.*  Labs were drawn and the doctor indicated that Mitchell

might benefit from further insulin sensitizers.  AR 451-452.

Mitchell returned for a follow up on February 19, 2010.  Mitchell reported he could not

tolerate the "met mix" as it caused rash.  AR 450.  Dr. Fisher diagnosed erectile dysfunction,

diabetes mellitus with increasing control and dyslipidemia.  *Id.*  Lab work was ordered, a

prescription of Chantix was refilled, Actos was prescribed, the dosage of Novolin was cut in half,

and Mitchell was asked to return for follow up in six weeks.  *Id.*

Mitchell returned for a follow up on June 1, 2010.  AR 448.  Dr. Fisher noted Mitchell's

neuropathic pain was under better control and that Mitchell seemed to be tolerating his

Gabapentin without difficulty.  *Id*.  The plan was to change the prescription from Metanx which

caused an allergic reaction.

On July 6, 2010, Mitchell returned for a follow up complaining of problems with erectile dysfunction which got worse since being on Risperidone.  AR 447.  He also complained that the Metformin "tends to bother him a bit more" when he consumes carbohydrates.  *Id.*  Dr. Fisher agreed to change the medication to Bupropion,[10] but only after Mitchell consulted his psychiatrist, and gave Mitchell samples of Viagra.  *Id*.  Dr. Fisher also noted continued hypertension, nicotine abuse, diabetes mellitus, and mood disorder.  *Id*.  He was told to return for follow up in six weeks.  *Id.*

Mitchell continued to treat with Dr. Fisher at Healthcare Partners between October 20, 2010, and August 12, 2011.  AR 537-558 (the index of the Administrative Record indicates these are also records of Rainbow Medical Center).  On October 10, 2010, he was there for a follow up and reported he had recently been hospitalized at UMC for numbness in the left arm and left leg that lasted for about twenty minutes.  AR 558.  The numbness was gone and he reported he had virtually stopped smoking and started an exercise program.  *Id.*  The plan was to discontinue Actos and refer to cardiology for a stress test with a follow up in six weeks.  *Id.*  He was seen in a follow up visit on November 9, 2010.  The medication to help him stop smoking was adjusted.  AR 555.  He was seen on January 4, 2011, complaining of coughing and chest congestion.  AR 550.  A May 26, 2011, visit discussed pain management and his blood pressure which Mitchell reported was uncontrolled and had been as high as 220 at home.  AR 547-549.  The active problems reported were diabetes mellitus, hypercholesterolemia, hypertension, and peripheral neuropathy.  AR 548.  The plan was to adjust some medications and refill others.  AR 549.

On August 12, 2011, he was seen to review the results of the laboratory tests, medication management and cholesterol and right hand pain.  AR 537-539.  Active problems were described as bipolar disorder, chronic pain, current smoker, diabetes mellitus, hypercholesterolemia, hypertension, overweight, peripheral neuropathy, and rosacea.  AR 537-538.  The doctor

---

[10] Used to treat depression.  *See* Mayo Clinic, *Bupropion (Oral Route)*, Mayo Clinic (Feb. 1, 2014), available at http://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last visited June 18, 2014).

1   discussed his non-compliance with taking blood pressure medication, recommended forty

2   minutes of exercise daily, and ordered prescription refills.  AR 538-539.

3       He was seen November 15, 2011, for follow up on his blood pressure and sugar level.

4   AR 643-645.  Lab tests were also ordered.

5       **11.    Pastora Roldan Psychiatric Review Technique & RFC Assessment.**

6       On December 16, 2010, Dr. Pastora Roldan, Ph.D., completed a psychiatric review

7   technique form for Mitchell.  AR 466-479.  She checked the boxes for organic mental disorders,

8   affective disorders, and personality disorders for the categories on which the medical disposition

9   was based.  AR 466.  She noted ADHD NOS as a medically determinable impairment present

10  that did not precisely satisfy the diagnostic criteria for organic mental disorders.  AR 467.  She

11  determined Mitchell's bipolar I disorder, most recent episode mixed, severe with psychotic

12  features did not precisely satisfy the diagnostic criteria for an affective disorder.  AR 469.

13      She found that Mitchell had inflexible and maladaptive personality traits which cause

14  either significant impairment in social or occupational functioning with subjective distress as

15  evidenced by pathologically inappropriate suspiciousness or hostility, persistent disturbances of

16  mood or affect, pathological dependence, passivity or aggresivity, and intense and unstable

17  interpersonal relationships and impulsive and damaging behavior.  AR 473.  She found that his

18  anti-social personality disorder did not precisely satisfy the diagnostic criteria for personality

19  disorders.

20      With respect to functional limitations, she concluded Mitchell's mental disorders caused

21  mild limitations in his activities of daily living and moderate difficulties in maintaining social

22  functioning, maintaining concentration, persistence, or pace.  AR 476.  Mitchell had no episodes

23  of decompensation, each of extended duration.  *Id*.

24      The evidence did not establish the presence of the "C" criteria."  AR 477.

25      Dr. Roldan also completed a Mental RFC Assessment of Mitchell on December 16, 2010.

26  AR 488-491.  She found Mitchell was not significantly limited in his ability to remember

27  locations and work like procedures; understand and remember very short and simple instructions;

28  carry out short and simple instructions; perform activities within a schedule; maintain regular

attendance and be punctual with customary tolerances; ability to sustain ordinary routine without specific supervision; make simple work-related decisions; ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places that use public transportation; and set realistic goals or make plans independently of others.  AR 488-489.

She found that he was moderately limited in his ability to understand or remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; work in coordination within proximity of others without being distracted by them; complete a normal day and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rests; interact appropriately with the general public; and accept instruction and respond appropriately to criticism from supervisors.  *Id.*

Dr. Roldan concluded Mitchell was able to understand and remember simple work procedures and could sustain attention and concentration for simple tasks in two-hour increments.  AR 490.  Additionally, Dr. Roldan opined Mitchell would be able to sustain an eight-hour workday or forty-hour workweek on a sustained basis.  *Id.*  Furthermore, Dr. Roldan noted Mitchell would be able to interact appropriately with the public and co-workers in brief, casual encounters, and be able to respond appropriately to non-confrontational feedback and supervision.  *Id.*  However, continuous and prolonged contact with others should be limited.  *Id.*  Finally, Dr. Roldan concluded Mitchell was able to travel, avoid workplace hazards, respond to change, and set realistic goals for himself.  *Id.*

### 12.    Dr. George Nickles, Physical RFC Assessment

Dr. Nickles conducted a physical RFC assessment December 16, 2010.  AR 480-487.  His primary diagnosis was diabetes with a secondary diagnosis of bilateral knee degenerative disease, and obesity as an additional impairment.  AR 480.  He opined Mitchell could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk six hours in an eight-

hour work day, sit six hours in an eight-hour work day with normal breaks, and had the unlimited ability to push and/or pull. AR 481. He could frequently balance, only occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. AR 482. He could occasionally stoop, kneel, crouch, and crawl. *Id.* No manipulative or visual limitations were established. AR 483. He should avoid concentrated exposure to extreme cold and all exposure to hazards such as machinery and heights. AR 484. No other environmental limitations were noted. *Id.*

### 13. Family Guidance and Wellness Network – Dr. Norma Memo.

On May 11, 2010, Mitchell saw Dr. Norma Memo for therapy and medication management regarding his anger and depression. AR 492-500. Dr. Memo's mental health assessment was that Mitchell was depressed and slept a lot. He had anxiety worrying about his family, no mania, and that his bipolar was primarily depressed. AR 495. Mitchell had conduct problems since a child with numerous incidents having to involve police intervention, poor anger control/explosive becomes physical. *Id.* He complained of violent episodes that had resulted in serious legal consequences. *Id.* He also reported a history of severe physical abuse by his natural mother as a child, using crystal meth fourteen years prior, and stopping alcohol use in 2004. AR 496. He thought about death but had never made plans and sometimes felt he would "blow up" and "they" better get out of the way. *Id.* He reported alcohol abuse and domestic violence, both physical and verbal, by his natural mother, and that his girlfriend was also bipolar. *Id.*

Dr. Memo's diagnosis was bipolar disorder NOS, intermittent explosive disorder, physical abuse, sexual abuse, diabetes, high blood pressure, and angina. AR 497. She recommended behavioral health counseling and therapy once a week. Dr. Memo noted Mitchell suffered from mood instability that significantly impaired him socially and occupationally. AR 499. The goal was to identify and develop awareness of thoughts that reflect a depressive schemata. *Id.* She noted Mitchell appeared to be motivated to change his current thinking patterns. *Id.* Additionally, Dr. Memo noted Mitchell failed to resist aggressive impulses that result in serious aggressive acts against others and property. *Id.* The goal was to resolve

underlying conflicts and develop alternate ways to think about and manage anger.  *Id.*  Dr. Memo

further noted that Mitchell was aware of his behavior and stated a willingness to change.  *Id.*

### 14.    Interventional Pain Medicine – Dr. Crispino S. Santos.

On January 11, 2011, Mitchell saw Dr. Crispino Santos on a referral from his primary

care physician, Dr. Fisher, for evaluation and pain management.  AR 501.  He reported chronic

upper back pain and neck pain resulting from a car accident in 2001.  *Id.*  Mitchell also reported

that he had received chiropractic treatment in the past and tried medication including Lortab for

pain.  X-rays were taken several years prior.  *Id.*  He also reported a history of pain and

numbness in both legs secondary to peripheral neuropathy.  *Id.*  Mitchell reported a history of

hypertension, coronary artery disease, diabetes, arthritis and degenerative joint disease.  *Id.*  He

was currently taking Limitorol, Norvasc, Risperadone, Metformin, and Lisinopril.  *Id.*  On

physical examination he was alert and oriented, his blood pressure was 155/80.  *Id.*  He weighed

292 lbs. and was 5'11" tall.  He displayed mild cervical paraspinal muscle tenderness bilaterally

and tenderness at the thoracic paraspinal muscles bilaterally most severe at T4-T8.  *Id.*  Dr.

Santos assessed chronic thoracic spinal pain, hypertension, coronary artery disease, diabetes,

history of peripheral neuropathy, arthritis, degenerative joint disease.  AR 501-502.  Dr. Santos

prescribed hydrocodone and recommended a diagnostic medical branch nerve block bilateral[11] at

T4, T5, T6, and T7.  AR 502.  Mitchell agreed and the plan was to reevaluate him after this

procedure.  *Id.*

### 15.    Desert Orthopedic Center – Dr. Chad Henson.

On Oct. 17, 2011, Mitchell saw Dr. Chad Henson for long-term knee pain.  AR 511.

Mitchell stated he received one day of physical therapy but discontinued treatment because he

did not see any improvement.  *Id.*  Dr. Henson noted Mitchell's knees had full range of motion,

no evidence of ligament instability, and no evidence of bilateral infection.  *Id.*  Mitchell had no

joint line tenderness, but did have apprehension in the patellar region, and mild crepitus in the

---

[11] A procedure in which an anesthetic is injected near small medial nerves connected to a specific facet joint.  Ray M. Becker, M.D., *Medical Branch Nerve Blocks*, Spine-Health, (Oct. 14, 2013), available at http://www.spine-health.com/treatment/injections/medial-branch-nerve-blocks (last visited June 18, 2014).

patellofemoral articulation.  *Id.*  He had a mildly, positive J sign and tenderness over the patellar

tendons bilaterally.  *Id.*  X-rays were obtained that showed preserved joint spaces with the

exception of narrowing in the patellofemoral articulation, but that he was "not down to bone-on-

bone yet."  *Id.*  The impression was bilateral knee patellofemoral syndrome with patellar

tendonitis.  *Id.*  Dr. Henson recommended a conservative treatment strategy.  Physical therapy

orders were given as well as a prescription for braces.  AR 512-513.

On December 12, 2011, Mitchell returned for a follow up.  AR 564.  Mitchell stated he

could not find anyone to pay for the prescribed knee braces.  *Id.*  He reported his pain doctor had

put him on Daypro that seemed to help quite a bit.  *Id.*  On physical examination, Mitchell had

tenderness over the patellar tendons bilaterally and pain with compression of the patella of the

trochlear groove.  *Id.*  The impression was bilateral knee chondromalacia and patellofemoral

syndrome with patellar tendonitis.  *Id.*  The plan was to switch insurance, try to get him back into

therapy, and try the braces as well.  *Id.*

### 16.    Advanced Spine & Pain Center – Dr. Edward Outlaw

On July 14, 2011, Mitchell saw Dr. Edward Outlaw based on a referral from Dr. Fisher

for neck pain.  AR 526.  Mitchell reported he had neck pain for approximately four to five years,

and mid back pain since 2000.  *Id.*  He reported that he saw a chiropractor, but never had

injections and no recent MRI.  *Id.*  Mitchell stated that exertion and heavy lifting increased the

pain, and that lying flat decreased it.  He described his pain as a seven on a scale of zero to ten.

*Id.*  After physical examination, Dr. Outlaw's impressions were neck pain, bilateral C2-C3 to C4-

C5, facet joint dysfunction, thoracic spine pain, and bilateral T4-T5 to T7-T8 facet joint

dysfunction.  AR 527.  Dr. Outlaw prescribed Lortab 7.5/500 and recommended physical

therapy, and follow up in approximately one month for reevaluation.  *Id.*  A prescription for

physical therapy was given.  AR 535-536.

### IV.    **The ALJ's Decision**

The ALJ followed the five-step sequential process set forth in 20 C.F.R. §§ 404.1520 and

416.920 and issued and unfavorable decision on December 21, 2011.  AR 22-32.  At step one,

the ALJ determined Mitchell had not engaged in SGA since March 2, 2010, the application date.

AR 24.  At step two, the ALJ determined Mitchell suffered from the following severe impairments: diabetes mellitus with a history of neuropathy, degenerative joint disease of the bilateral knees, obesity, attention deficit hyperactivity disorder, not otherwise specified, anti-social personality disorder, bipolar disorder, and history of back pain.  *Id*.  The ALJ found these impairments were severe because they had more than a minimal effect on Mitchell's' ability to do basic physical or mental work activity.  *Id*.

At step three, the ALJ determined Mitchell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id*.  The ALJ considered Mitchell's statements and testimony, the third party function reports, the objective medical evidence, and the progress notes of Dr. Stolinsky and Dr. Zedek in determining Mitchell's impairments.  He found that none of Mitchell's treating or examining physicians had recorded findings equivalent in severity to the criteria of any listed impairment.  AR 24.  Specifically, the ALJ found Mitchell did not meet Listings 12.04 and 12.08.  AR 25.  In doing so, the ALJ considered whether Mitchell satisfied the Paragraph B criteria.  *Id*.  The ALJ found Mitchell's mental impairments caused mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  *Id*.  The ALJ found Mitchell had no episodes of decompensation of extended duration.  *Id*.  Because Mitchell's mental impairments did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration, Mitchell did not satisfy the Paragraph B criteria.  *Id*.

The ALJ considered whether Mitchell satisfied the Paragraph C criteria of Listing 12.04 and 12.08.  *Id*.  The ALJ found no evidence of repeated episodes of decompensation of extended duration.  *Id*.  Additionally, the ALJ found no evidence of a residual disease process that even a minimal increase in mental demands or change in environment would be predicted to cause Mitchell to decompensate.  *Id*.  Finally, the ALJ found no evidence that Mitchell would be unable to function outside of a supportive living arrangement for more than a year.  *Id*.  Because

/ / /

1    the ALJ found no evidence of the above criteria, the ALJ determined Mitchell did not satisfy the

2    Paragraph C criteria of Listing 12.04 and 12.08.

3         The ALJ determined Mitchell had the RFC to perform a range of light work as defined in

4    20 C.F.R. § 416.967(b), except that Mitchell should be limited to work with only occasional

5    interaction with supervisors, coworkers, and the public.  AR 26.  The ALJ determined that

6    Mitchell's statements concerning the intensity, persistence, and limiting effects of his symptoms

7    were not credible to the extent they were inconsistent with the ALJ's RFC finding.  *Id.*  The ALJ

8    considered Mitchell's testimony regarding his daily living activities that he took care of his

9    daughter, prepared meals for his family, and shopped for groceries.  AR 27.  The ALJ noted that

10   the physical, mental, and social requirements to perform these activities are the same

11   requirements necessary for obtaining and maintaining employment.  *Id.*

12        The ALJ found that Mitchell was not entirely credible because his allegations concerning

13   the severity of his symptoms and limitations was diminished because those allegations were

14   greater than expected in light of the objective evidence of record.  *Id.*  He cited the medical

15   evidence which indicated that Mitchell received routine conservative treatment for complaints of

16   back and knee pain and bipolar disorder, and concluded that the lack of more aggressive

17   treatment or surgical intervention suggested that Mitchell's symptoms and limitations were not

18   as severe as he claimed.  AR 27-28.  He also found that the medical evidence did not contain

19   significant findings to support the alleged level of pain.  AR 28.  The treatment he received for

20   back and knee pain was only medication.  *Id.*  Additionally, treatment notes indicated Mitchell

21   was only mildly depressed and had shown significant improvement with medication compliance.

22   *Id.*  For these reasons, he found the positive objective clinical and diagnostic findings since the

23   alleged date of onset did not support more restrictive functional limitations than he found.  *Id.*

24        The decision reviewed medical records assessing Mitchell's physical conditions

25   including x-rays, MRIs and lab reports relating to his diabetes, neuropathy and knee pain.

26        The ALJ afforded significant weight to the opinions of psychological consultative

27   examiner, Stephanie Stolinsky.  AR 29.  Dr. Stolinsky's mental status examination revealed

28   positive findings for anxious mood and affect, but were otherwise unremarkable.  AR 28.  She

diagnosed bipolar I disorder, attention deficit disorder not otherwise specified, and anti-social personality disorder, and  assessed a global assessment of functioning (GAF) score of 50 indicating serious symptoms or difficulty functioning.  *Id.*  He found that Dr. Stolinsky opined that Mitchell would be able to perform simple, straightforward tasks but might have serious anger and aggression problems relating to co-workers, supervisors and the general public.  AR 29.  The ALJ noted that progress notes from December 2010 through October 2011, indicated that Mitchell was only mildly depressed, and that a December 2010 progress note stated that the increase in medication had helped a lot.  *Id.*

The ALJ also concluded that nothing in the record contradicted the state agency medical consultants' opinions with respect to Mitchell's residual functional capacity, both physical and mental.  *Id.*  Dr. Stolinsky assessed functional limitations that were essentially the same as those included in the residual functional capacity assessment of the ALJ.  *Id.*  She personally observed and examined Mitchell.  The ALJ found that positive objective diagnostic findings in the medical evidence of record were from her examination of Mitchell and consistent with those objective findings.  *Id.*

In considering Mitchell's mental residual functional capacity, the ALJ considered, but did not give controlling weight to the opinion Dr. Zedek, Mitchell's treating physician, as documented in the mental disorder questionnaire.  *Id.*  The ALJ found that Dr. Zedek's opinion should not be given controlling weight because the doctor did not document significant positive objective clinical or diagnostic findings to support the assessed functional limitations, and because these extreme functional limitations were inconsistent with the record as  whole.  *Id.*  Because the ALJ did not give Dr. Zedek's opinion controlling weight, he weighed all the medical opinions and considered multiple factors.  *Id.*  For example, he considered the length of the treating relationship, the frequency of examination, and the nature and extent of the relationship.  *Id.*  He also considered whether testing and consultative evaluations were done by specialists, and supported by explanation or objective evidence consistent with the record as a whole.  *Id.*  He found that Dr. Zedek did not document positive objective clinical or diagnostic findings to support his functional assessment.  AR 30.  Additionally, Dr. Zedek's treatment notes showed

1  subsequent improvement on medication.  The ALJ found that Dr. Zedek's functional limitations

2  assessment was not consistent with the record as a whole including Mitchell's activities of daily

3  living.  *Id.*  The ALJ concluded that Mitchell's subjective complaints were less than fully

4  credible because they were inconsistent with the objective medical evidence which did not

5  support the alleged severity of symptoms.  *Id.*

6        After considering all impairments in combination and determining Mitchell's RFC, the

7  ALJ found Mitchell was unable to perform his PRW.  *Id.*  The ALJ relied on the vocational

8  expert's testimony that Mitchell's impairments precluded him from performing his PRW as a

9  security guard, fast food worker, assistant store manager, or mechanic.  *Id.*

10        At step five, the ALJ determined that jobs existed in significant numbers within the

11  national economy that Mitchell could perform given his age, education, work experience, and

12  RFC.  AR 31.  The ALJ relied on the vocational expert's testimony that Mitchell could perform

13  the light unskilled work representative of occupations such as dishwasher, janitor, garment

14  presser, and dining room attendant, all of which exist in significant numbers in the national and

15  regional economies.  *Id.*  Considering Mitchell's age, education, work experience, and RFC, the

16  ALJ determined Mitchell was capable of making a successful adjustment to other work that

17  existed in significant numbers in the national economy.  *Id.*  Accordingly, the ALJ found

18  Mitchell was not under a disability, from November 1, 2009, to December 21, 2011, the date of

19  the ALJ's decision.  AR 32.

20  **V.    The Parties' Positions.**

21        Mitchell asserts the ALJ did not base his RFC assessment on substantial evidence.

22  Specifically, he contends the ALJ improperly rejected Dr. Stolinsky's opinion.  Mitchell claims

23  the ALJ failed to discuss Stolinsky's assessment that Mitchell "could decompensate if things

24  went wrong at work, if personnel changed, or if anything he was used to doing changed."  AR

25  367.  Mitchell argues that the ALJ's failure to consider Mitchell's ability to respond to changes

26  in a work setting when specifically addressed by an examining physician resulted in an "implicit

27  rejection" of that opinion.  Because the ALJ failed to articulate a legitimate reason for rejecting

28  / / /

Dr. Stolinsky's opinion, Mitchell asserts this court must credit the evidence as true and reverse

and remand for an award of benefits, or alternatively, for further proceedings.

The Commissioner argues that the ALJ properly considered Dr. Stolinsky's opinion and

appropriately relied on it in assessing Mitchell's RFC.  The ALJ discussed Stolinsky's opinion,

and specifically noted her conclusion that Mitchell could perform simple tasks "but might have

serious anger and aggression problems relating to coworkers, supervisors, and the general

public."  AR 367.  Additionally, because the ALJ limited Mitchell to unskilled work with only

"occasional interactions" with coworkers, supervisors and the general public, the ALJ did not

dismiss Stolinsky's finding that Mitchell "could have" serious anger and aggression problems at

work.

Additionally, the Commissioner argues the record sufficiently supports the ALJ's

conclusion that Mitchell could function in a work environment with his assessed mental

restrictions.  The medical records show that Mitchell's symptoms had markedly decreased since

December 2009 with medication and treatment.  Additionally, Dr. Roldan reviewed the record

and opined that Mitchell could perform simple tasks and maintain sufficient concentration to

complete a normal workweek.  AR 490.  Dr. Roldan also concluded Mitchell could appropriately

interact with coworkers and the public in brief encounters, but he should avoid prolonged

exposure and interaction with others.

Finally, the Commissioner contends Mitchell's own admissions regarding his daily living

activities support the ALJ's conclusion.  Mitchell stated he fed his daughter, got her dressed and

ready for school, picked her up from school, helped her with her homework, bathed her, and put

her to bed on a daily basis.

## VI.    **Analysis and Findings.**

Reviewing the record as a whole, weighing both the evidence that supports and the

evidence that detracts from the ALJ's conclusion, the court finds substantial evidence supports

the ALJ's decision and that the ALJ did not commit reversible error.  Mitchell argues the ALJ

erred in rejecting Dr. Stolinsky's opinion that Mitchell "could decompensate if things went

wrong at work, if personnel changed or if anything he was used to doing changed."  AR 363.

1    The court finds the ALJ did not reject examining psychologist Dr. Stolinsky's opinion at

2    all, but rather relied on it and afforded it "significant weight."  AR 29.  Dr. Stolinsky opined that

3    Mitchell could perform simple, straightforward tasks, but he might have serious anger and

4    aggression problems relating to supervisors, coworkers, and the public.  The ALJ agreed, finding

5    Mitchell had the RFC to perform light unskilled work with limited interaction with supervisors,

6    coworkers, and the public.  AR 26.

7        The ALJ found that Mitchell had the residual functional capacity to perform a range of

8    light work and could lift and/or carry twenty pounds occasionally, and less than ten pounds

9    frequently; stand and/or walk for six hours in an eight-hour work day; sit for six hours in an

10   eight-hour work day; occasionally climb ramps and stairs; and occasionally stoop, kneel, crouch

11   and crawl; could not climb ladders, ropes or scaffolds; that he must avoid exposure to highly

12   concentrated chemicals, dusts, fumes and cold temperature extremes; avoid hazards such as

13   unprotected heights and constantly moving machinery; and was limited to unskilled work with

14   only occasional interaction with supervisors, co-workers and the public.  AR 26.

15       The motion to remand does not challenge the ALJ's findings with respect to Mitchell's

16   physical residual functional capacity.   This is a change in position from that taken at the

17   administrative hearing.  At the hearing Mitchell testified he was unable to work because he had

18   difficulty walking, bending, stooping lifting or standing, and had issues being around large

19   groups of people.  AR 49.   The motion to remand argues Mitchell is unable to work because of

20   his mental impairments.  The motion to remand does not claim that Mitchell meets any of the

21   listings for mental impairments, and does not challenge the ALJ's findings in this regard.  This is

22   also a change in position from what counsel argued at the administrative hearing.  At the hearing

23   counsel suggested Mitchell met the Listings for mental impairments under 12.04, 12.06 and

24   12.08.  AR 41.  The motion to remand claims that the ALJ committed reversible error because he

25   rejected Dr. Stolinsky's opinions that Mitchell "could decompensate if things went wrong at

26   work, if personnel changed, or if anything he was used to doing changed."

27       Although the ALJ did not specifically comment on Dr. Stolinsky's statement that

28   Mitchell "*could* decompensate if things went wrong at work,"  (emphasis supplied) he did not

"implicitly reject" Dr. Stolinsky's opinion.  Mitchell relies on *Salvador v. Sullivan* for the proposition that failure to comment on an opinion equals an implicit rejection of the opinion. 917 F.2d 13, 15 (9th Cir. 1990).  However, in *Salvador*, the ALJ's conclusion was contrary to the doctor's opinion.  Here, the ALJ agreed with Dr. Stolinsky's opinion that Mitchell could perform simple, straightforward tasks.  In addition, the ALJ accepted Dr. Stolinsky's opinion that Mitchell was capable of performing simple, straightforward tasks, but might have serious anger and aggression problems relating to co-workers, supervisors and the general public.  He found that Mitchell had the residual functional capacity to perform a range of light work, but was limited to unskilled work with only occasional interaction with supervisors, co-workers, and the public.

In addition, the ALJ found Dr. Stolinsky's opinions were reasonable and consistent with the record as a whole, including the opinions of consultative examiner Pastora Roldan, Ph.D. AR 29.  Like Dr. Stolinsky, Dr. Roldan determined Mitchell could sustain a normal workweek schedule.  AR 490.  She found Mitchell could understand simple and routine procedures; interact appropriately in brief, casual encounters with the public and coworkers; respond appropriately to non-confrontational feedback from supervisors; and could adequately avoid workplace hazards and respond to change.  *Id*.  However, Dr. Roldan also noted Mitchell should be limited from "continuous and prolonged contact with others."  *Id*.

The ALJ also considered Mitchell's own testimony and statements regarding his daily activities, finding they were   consistent with Dr. Stolinsky's opinion that Mitchell could perform light unskilled work.  The ALJ may consider a claimant's daily living activities in determining disability.  *See* 20 C.F.R. § 416.929(c)(3)(i).  At the time of the administrative hearing, Mitchell had gained custody of all four children and was caring for them.  AR 43.  Mitchell admitted in adult function reports that he was able to care for his daughter and pets, prepare daily meals, perform household chores, including laundry, taking out the trash, general cleaning, and picking up after his dogs and go grocery shopping. AR 165-166.

Additionally, the ALJ considered and discussed the records and progress notes of Mitchell's treating physician, Dr. Zedek  in reaching his decision.  Dr. Zedek's progress notes

from December 17, 2009, through March 18, 2010, show Mitchell's mood swings and irritability were mild and much less intense than before.  His initial visit to Dr. Zedek was on December 10, 2009.  AR 411.  At the time of his initial visit, Mitchell reported that this was his first formal psychiatric contact and that he had never been psychiatrically hospitalized.  *Id*.  A week later, Dr. Zedek reported that his mood swings and irritability were much less intense.  He had additional problems in April and June 2010, which were effectively treated by medication.  Dr. Zedek's progress notes between December 30, 2010, and October 29, 2011, are very brief and indicate only that Mitchell reported feeling mildly depressed and that he and the doctor worked on staying positive and coping with stress.  AR 505-507.  The ALJ cited Dr. Zedek's progress notes in making his findings supporting the opinions of Dr. Stolinsky that Mitchell was capable of performing a range of light work limited to unskilled work with only occasional interaction with supervisors, co-workers, and the public.

Mitchell's motion to remand does not claim that the ALJ committed reversible error by rejecting the opinions of Dr. Zedek, Mitchell's treating physician.  The court finds that the ALJ considered and afforded considerable weight   to the opinions of Dr. Stolinksy,  and  that his decision was based on substantial evidence.

## VII.   Conclusion.

A decision to deny benefits will only be disturbed if it is not supported by "substantial evidence or it is based on legal error."  *Magallanes*, 881 F.2d at 750.  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id*.  Where evidence is susceptible to more than one rational interpretation, the district court must uphold the ALJ's decision.  *See Andrews*, 53 F.3d at 1039–40.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's.  *Flaten*, 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and differences of opinion.  Having reviewed the Administrative Record as a whole and weighed the evidence that supports and detracts from the Commissioner's

conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

For all of the foregoing reasons,

**IT IS RECOMMENDED THAT:**

1.  Mitchell's Motion to Remand (Dkt. #13) be DENIED.

2.  The Commissioner's Cross-Motion to Affirm (Dkt. #14) be GRANTED.

DATED this 23rd day of July, 2014.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE